AMERICAN AGAR & CHEMICAL CO. *v.* UNITED STATES

No. 8020.—Entered at San Ysidro, Calif.
Entry No. 8–C.

(Decided June 25, 1951)

*Philip Stein* (*Philip Stein* and *Marjorie M. Shostak* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Dorothy C. Bennett* and *Samuel D. Spector,* special attorneys), for the defendant.

EKWALL, Judge: This is an appeal for reappraisement filed by the importer from a finding of value made by the appraiser upon an importation of what is described on the invoice as "1045 Paper bags AGAR-AGAR (Bleached Flakes) (5 lbs. per bag)." The merchandise was manufactured by Compañía Mexicana de Agar, S. de R. L., of Ensenada, Mexico (which will be referred to hereafter as C. M. A.), from gelidium, a form of seaweed obtained on the west coast of Lower California, Mexico. According to the record, the principal uses

of this merchandise in Mexico are (1) in the packing of meats; (2) in the manufacture of candies and ice cream; and (3) in laboratory bacteriology work.

The merchandise was invoiced and entered on the basis of foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930 (19 U. S. C. § 1402 (c)), as amended by the Customs Administrative Act of 1938, at $2.25 per pound net packed f. o. b. Ensenada. It was appraised at 30 pesos (Mexican) per kilo, net packed. Whether the appraisal was made on the basis of foreign value or export value does not appear from the record. However, it was made on the basis of the value of what the appraiser considered similar merchandise manufactured by Alga-Mex, S. A. de C. V. (referred to hereinafter as Alga-Mex), in July 1944, according to the statement of counsel for the Government at the trial.

It is contended on behalf of the plaintiff that the merchandise used as a basis of comparison is not similar merchandise and, further, that there was a foreign value for identical merchandise, and that such value was $2.25 per pound, net packed, f. o. b. Ensenada, which was the entered value. Counsel for the plaintiff contends that evidence should be considered pertaining to other importations of identical merchandise produced by the same manufacturer and entered at the same port of entry during the period from July 20, 1944, to and including January 16, 1945. In all of these entries appraisement was withheld by the appraiser at San Diego in conformity with section 14.3 (g) of the Customs Regulations of 1943. Government counsel objected to any testimony being introduced as to these entries which occurred long after the date of exportation of the merchandise covered by this case. Although the testimony was admitted, I find that as to prices offered or paid subsequent to July 20, 1944, it can have no weight. *United States* v. *A. S. Neuberger and American Glanzstoff Corp.*, 19 C. C. P. A. (Customs) 96, T. D. 45241; *Butler Bros.* v. *United States*, 73 Treas. Dec. 1478, Reap. Dec. 4277. The shipments involving the withheld appraisements are not before me and any testimony tending to show the dutiable value of that merchandise will not be considered. Counsel for the plaintiff contends that the dutiable value of those shipments is dependent upon the decision in the instant case. The regulations governing withheld appraisements are set forth in section 14.3 (g) and (i) of the Customs Regulations of 1943, and are as follows:

(g) If an importer is dissatisfied with the value which an examiner contemplates reporting for merchandise imported by him, and one or more appeals for reappraisement shall be promptly filed by him or by another importer which will present all the issues in controversy for judicial determination, the appraisement of other merchandise in which the same issues are involved may be withheld at the request of the importer if all the following conditions are satisfied:

\*      \*      \*      \*      \*      \*      \*

(*i*) If the final decision of the court does not sustain the views of the examiner, the importer shall be permitted to amend the entered values to agree with the final appraised values in the test case or cases, provided such amendment can be accepted under the provisions of section 487, Tariff Act of 1930. (See sec. 8.16.)   *   *   *

The purpose of these regulations was to extend a privilege to the importer to make entry as therein prescribed in order to avoid assessment of additional duties on an issue which had not been determined. Appraisement is withheld until a final determination of the issue. When the issue shall have been determined, the importer may amend its entry either to comply with the court's judgment, or to show a value which it believes to be correct under section 487 of the Tariff Act of 1930. It is provided in that section that an entry may be amended at any time before appraisement or before the merchandise has come under the observation of the appraiser for the purpose of appraisement. There can be no logic in maintaining that merchandise the appraisement of which is withheld, has come before the appraiser for the purpose of appraisement. Therefore, under the statute there can be no bar to an amendment of the entry. Any other conclusion would nullify the intent and purpose of the regulations.

Plaintiff introduced the testimony of three witnesses, Mr. Benjamin W. Shipman, vice president of plaintiff corporation, Mr. Horace H. Selby, plaintiff's chemical engineer, and Mr. L. K. Small, at the time of the hearing, president, but at the time of this importation, managing director of plaintiff corporation. Plaintiff also offered and there were received a sample of bleached flake agar-agar manufactured by C. M. A. (the merchandise before us) as exhibit 1; three samples of Alga-Mex merchandise tested by plaintiff's chemical engineer for comparison with the instant product (exhibits 2, 3, and 4). Plaintiff also offered and there was received in evidence as exhibit 8 an affidavit of the president of Alga-Mex, the manufacturer of the so-called similar merchandise on which appraisement of the instant merchandise was based, in which it was stated that no bleached flake agar-agar was manufactured, sold, or offered for sale by his company during the period covered by this importation.

The Government presented no oral testimony, but introduced in evidence a report of plaintiff's chemical engineer and three reports of a Treasury representative. Plaintiff's counsel objected to these reports on the ground that they were too remote. They were admitted over objection as collective exhibits 10 and 11. Counsel for the Government stated that the appraisement was made on the basis of these reports which cover the date of exportation of the merchandise before the court.

From the testimony of Mr. Shipman, vice president of the plaintiff corporation, it appears that the plaintiff furnished the equipment and money to C. M. A. with which to construct a plant. The only right

plaintiff had was to purchase excess raw materials and it was to take such agar-agar as C. M. A. produced and did not use in Mexico. C. M. A. was to confine its export sales to the United States to the plaintiff. This agreement was in effect a few months. C. M. A. from June 1944, and perhaps a short time prior thereto, did make offers in Mexico and thereafter also made offers of this agar-agar in the United States. The witness made inquiries in the United States and in Mexico through the office of our Government in Mexico as to whether there were any manufacturers of identical merchandise. As a result of these inquiries, he found out that there was a company called Alga-Mex on the outskirts of Mexico City. He saw the plant and the product on several occasions. This company was manufacturing ground agar until August 1945. It was dried on canvas sheets or boxed enclosures, then scraped off and ground. The raw materials were secured from the vicinity of Ensenada. The witness saw all of the products the Alga-Mex was manufacturing and offering for sale at or about the time of exportation. He saw the facilities they had at the plant and the changes, if any, that had taken place in them over a period of time from 1943 to and including May 1948 with certain exceptions not here material. He obtained samples which he had analyzed at the American Agar plant in San Diego. C. M. A. did not manufacture any ground agar. Alga-Mex was not in a position to manufacture flake agar from the beginning of 1944 up to and including the middle of August 1945.

As to the uses of the instant product, the witness stated that it is used principally in laboratories for bacteriological use and also is sold to people who manufacture impression material used by dentists for the purpose of precision work. The price at which C. M. A. was offering its merchandise for sale for domestic consumption in Mexico, as well as for export on or about July 20, 1944, the date of exportation herein, was $2.25 a pound. In Mexico, 300 kilos is regarded as a wholesale quantity for the Alga-Mex product. The witness considered the wholesale quantity of bleached flake agar-agar to be 100 pounds in 5-pound bags. In July 1944, Alga-Mex was offering its ground agar-agar at a price equivalent to $2.50 per pound f. o. b. Nuevo Laredo. The ground agar-agar was packed in containers made either of cardboard or plywood containing 10, 20, 30, or 40 kilos. The witness did not know of any sales at any higher prices at the time of exportation. To his knowledge, there were no sales or offers by Alga-Mex of bleached flake agar-agar. He did not know whether any form of agar-agar was being offered by Alga-Mex at 30 pesos per kilo. From his personal knowledge of their uses, he would say that the ground agar-agar manufactured by Alga-Mex and the bleached flake agar-agar such as here involved are absolutely dissimilar and are not used for the same purpose. In enumerating the points of dissimilarity, he stated:

The product manufactured at Ensenada, Lower California, is manufactured under conditions similar to those that prevail here at San Diego. It has quite similar supervision. It is put up in a flake form. Certain demands of purity are made of that product. The product in Mexico City * * * was manufactured in more or less what we consider a pilot plant. It was somewhat of a makeshift plant. The product that they were making could not be made in a flake form. They had no provision even for the drying that is necessary to use for the purpose of drying a flake agar, which takes starch. They did not have the starch * * * when I saw the plant last before seeing it again this year. The product, by reason of the manufacture * * *, was impure, and could not be used for the bacteriological uses and the other uses for which we sell our product in this country, and for which the product manufactured at San Diego and the product manufactured at Ensenada was useable and used at all times.

The ground form of agar-agar was never in flakes. It is spread out and dried on canvas. It costs more because in grinding, friction and heat are engendered, which take out more moisture, and the cost of the grinding must also be considered.

On cross-examination, the witness stated that the American Agar & Chemical Co. had no ownership interest in the Ensenada plant; that the money was supplied to C. M. A. in order that the American company be permitted to receive raw material, i. e., seaweed, from the Mexican company, and also the American company was obligated for a certain period of time (which included the date of exportation here involved) to take the finished product of C. M. A. if it was not sold in Mexico. The American Agar & Chemical Co. does not own the Mexican plant, has no mortgage on it, and does not participate in the profits or expenses of the Mexican company. The witness stated that there was a market in Mexico for a small quantity of agar-agar manufactured by Alga-Mex up until the end of 1944. The prices quoted in Mexico were in pesos per kilo. There were only two producers of agar-agar in Mexico, C. M. A. and Alga-Mex. In attempting to obtain information as to the markets for agar-agar in Mexico, this witness made inquiries at the Embassy, at the Foreign Economic Administration which was in touch with all of the users of products of agar, and through his company he knew that the raw weed from which agar was being produced was obtained on the Pacific coast and the purchasers for that weed were the plants of C. M. A. at Ensenada and Alga-Mex in Mexico City. Other investigations were made through various types of publication, such as trade magazines. While the witness found no markets except Ensenada and Mexico City for identical products, agar-agar was being sold in very small quantities in Monterrey and at San Luis Potosi, Mexico.

According to this witness' testimony, prices of the instant commodity did not depend upon the quantity. Prior to 1945, no prices were quoted to him by Alga-Mex. He visited the Mexico City plant of Alga-Mex in October 1944 and asked about prices, but was not quoted any prices for sale to his company until 1945. His company

never purchased any of the Alga-Mex product. He had a chemical analysis made of the Alga-Mex product in 1943 and again in October 1944 and in 1945. As to the method of drying the Alga-Mex product, the witness had observed the product in a tray with a canvas bottom, and also saw some in a retort or long bake oven. So far as he knew, the heating process in the oven was steam. He saw some of the product in the yard exposed to the sun. The instant product in its flake form as imported is not ready for use either in laboratory work or for dental work. While the commodity is sold to the laboratory-supply business and the dental-impression business primarily, probably the larger quantities go to suppliers of laboratories.

On redirect examination, the witness stated that there is no comparison in texture between the ground and the flake agar-agar. They are not commercially interchangeable, because the instant product was made under different conditions, was carefully processed, and was intended to and did supply a different trade. It would be impossible to use the Alga-Mex product for laboratory purposes. His information as of July 1944 was that Alga-Mex was offering at $2.50 delivered at Nuevo Laredo, Mexico. All sales in Mexico were in kilos and in Mexican currency. The price of $2.25 per pound was, in fact, 24 pesos per kilo f. o. b. Ensenada, and the price of $2.45 per pound was 26 pesos, 14 centavos per kilo, f. o. b. Ensenada. The rate of exchange used in this calculation was the official rate, 4.85 pesos. At the time of this importation, the uses of agar-agar were restricted, but in a normal period it has wide uses.

Mr. Selby, a chemist connected with the plaintiff company, engaged in research connected with the manufacture, use, and constitution of agar-agar for the last 4 or 5 years, stated that he has made frequent tests of bleached flake agar-agar imported by the plaintiff and manufactured by C. M. A. He has also examined all forms of agar-agar including the products of Alga-Mex which he has analyzed. He did not make a separate analysis and test of the instant importation but made thorough-going tests of each batch of agar-agar that went into that importation quite a long time before the importation occurred, samples of which he received according to the usual practice from the manager of C. M. A. There are perceptible differences in appearance in bleached flake agar produced by C. M. A. and imported by the plaintiff company; they might differ in size of flakes or shape, but in a general comparison there is no commercial difference and no significant chemical differences. The witness has noticed no differences in the batches in 1944. He produced samples of agar-agar manufactured by Alga-Mex, together with analyses thereof, and testified that they do not resemble in appearance the bleached flake agar-agar imported by plaintiff company. The greatest difference in appearance are due to the granular nature of the Alga-Mex agar-agar,

its comparative darkness, and its apparent contamination with carbonization material. The first sample offered and received in evidence as exhibit 2 was received by the witness in August 1943. The second sample was received in November 1944 and was marked exhibit 3 over the objection of the Government. The remaining samples were received in 1945 and 1946, and under our holding are not material. The witness stated that in a general sense the samples of the Alga-Mex product and the C. M. A. product differ and in explanation of the manner of difference said:

* * * There are two standards which are official in the United States for the qualities of agar. One is the National Stock Catalogue Specification of the United States Army for bacteriological agar, and the other is the United States Pharmacopoeia, which Mr. Shipman mentioned before. Samples of Alga-Mex more than half the time failed to meet the requirements of the United States Pharmacopoeia in the first place, and all the time they failed to meet the insoluble matter of the Army specification. That is one particular difference which might have a bearing on the case. Another is that what is called the clarity of solution of these agar samples from Alga-Mex, which is uniformly very low. By clarity of solution I mean that if a solution is made up of agar and distilled water, it can be placed in an apparatus beneath which is some standardized illuminated printing. The depth of this solution can be varied over that printing until the printing becomes illegible, and the number of millimeters of solution to which this printing can remain legible is considered in millimeters the clarity of the solution. Normally the C. M. A. agar will have a clarity between 300 and 800 millimeters by that test. The Alga-Mex samples have 88, 100, 240, 80, 30 and 10, which makes such a product not utilizable by bacteriological laboratories without further costly purification. Those are two examples.

The two products, according to this witness, could not be interchangeably used with equal ease and the Alga-Mex products could not be used for all the purposes and the main purposes for which bleached flake agar is used. The witness was not familiar with the use to which the Alga-Mex products are put. From his analyses and also his knowledge of the latter, he would say that it could not successfully be used in place of the bleached flake agar of C. M. A. There are many uses in which Alga-Mex ground agar could not be employed but for which the bleached flake agar could easily be employed. In the manufacture of storage battery separator plates, the cruder types of impression material, and the canning of fragile meats, such as chicken, either could be employed. In Mexico, agar is used for the culture of orchids, has some laboratory uses, also as a "jellifying" agent in some foods, and is used by some candy makers. For those uses, the two products cannot be used with equal public-health security nor with equal mechanical facility. In explanation of his statement that the two products were not interchangeable with equal ease, the witness stated that he meant the use of agar in the enumeration of bacteria, fungi, etc.; the manufacture of antitoxins and vaccines. For that type of use, when agar is placed in solution, it is

used for one large purpose which takes advantage of about six unique physical properties of agar. One is that agar in solution in water, or in colloidal suspension, will remain as a liquid as it cools down, and will not form a firm jell until at the approximate temperature of the human body, about 100 degrees Fahrenheit. The most important is that this jelly must be inert to the things that are going into it. It must neither contribute to their metabolism nor must it detract from growth due to any inhibiting factors. Agar is the only thing that is known that will work satisfactorily for this class of use, and when such agar plates or tubes, or rolls, as they are techically called, are used for the study of microorganisms, the medium must be clear, so that the extra clarity due to penicillin, or the decreased clarity due to growth of actual organisms, can be seen and properly studied. Also, when some small semiliquid colonies of bacteria are formed, unless the jell is quite clear, the agar will not be suitable. The samples of the Alga-Mex material which the witness had examined are so uniformly low in clarity that they could not be employed for this particular use unless they were put in solution, treated quite extensively, and filtered again before use, which processes most laboratories are not fitted to perform. In the use of agar as a laxative, its major advantage is that it can be easily absorbed and hold water and other fluids and form a gelatinous mass which has a lubricative tendency in the human intestines. The physical form is the thing which is of paramount importance. Much greater effort would be required in the use of one than the other, and further processing in many instances. The witness admitted that for use in storage battery plates and in meat canning, the two commodities would be commercially interchangeable. The witness did not know whether he had made any analysis of Alga-Mex agar which was manufactured and sold during the first 6 months of 1944. As to the samples of the instant merchandise, he stated they were submitted to him prior to the date of this importation unless the importations of some particles of this lot might have been imported immediately after manufacture. There is normally a 3- to 7-day delay between the manufacture and his receipt of the sample. In explanation of his statement on direct examination that there was no significant difference between the various samples which he had analyzed of agar flakes made by C. M. A., the witness stated that he used the word "significant" with the meaning of "important"; that an unimportant difference might be the difference between 16 per centum moisture and 20 per centum moisture; that it is not unusual for samples to differ in that respect from time to time; that an unimportant difference consisted of small changes in any of the determined properties of a sample. Such differences of the order of one-hundredths of 1 per centum in the jell strength would be insignificant.

There was received in evidence as exhibit 5 a compilation or résumé, made at the time of the hearing, of the analyses of exhibits 2, 3, and 4.

It was stated by this witness that among all the products of Alga-Mex which he tested and analyzed, he had found none with the same properties as the importation here involved made by C. M. A. Further, that there are one or two instances in which the better of the Alga-Mex samples might be used interchangeably with average C. M. A. samples; that the use in battery plates is a very rare and occasional one; that in meat canning, they would be used in one of the forms in which exhibits 2, 3, and 4 now exist. No agar could be used for the manufacture of storage battery plates, or for the canning of meat without first being put into some form of suspension or solution; but the process would not be the same for both products. As to the difference in moisture, he stated the moisture in a given sample differs momentarily. All ground agar, regardless of its origin, tends to keep the moisture content relatively more stable and uniform than the flake form. Therefore, there would be much greater difference from time to time in the same particle of flake agar as far as moisture is concerned than there would be in the ground agar represented by exhibits 2, 3, and 4. The moisture content depends upon the atmospheric conditions.

In all uses of agar, the witness testified, except as a laxative, it is necessary to put the agar in suspension or solution. Exhibit 1, the instant merchandise, is ready for laxative use in the condition as imported, whereas exhibits 2, 3, and 4 are not. For dental impression use, exhibit 1 is mixed or mulled violently at elevated temperature with various substances, softeners, hardening salts, moisture, or water, which process would tend to antisepticize the agar. In the manufacture of vaccines and sera, the treatment to which the agar is subjected before its ultimate use would also tend to antisepticize it. All physical properties in varying degrees of intensity are present and common to both exhibit 1 and exhibits 2, 3, and 4. Ground agar represented by exhibits 2, 3, and 4 could not be used in the same way as exhibit 1 for making substances such as vaccines, because some of the physical properties, most important of which in this respect would be clarity of solution, are too low for proper use in the manufacture of vaccines and sera. The witness knew of no instance in which the two products could be used interchangeably by an identical process, treatment, and machinery. As to the machinery processes, the canning of meats, for example, the placement of samples of the ground agar in water solution is more difficult due to their tendency to what is called "ball-up," and therefore the handling of exhibits 2, 3, and 4 would have to be different from that of exhibit 1. Exhibits 2, 3, and 4 are not adaptable for use in vaccines, sera manufacture, penicillin, bacteria, and fungal counts in

general, even with a moderate amount of extra care and attention, whereas exhibit 1 can be so used. The reason for this is that the physical properties of the exhibits 2, 3, and 4 make them unsuitable for such use. In addition to the sanitary reasons and the clarity of solution, there are two more reasons why they are unsuitable; the nonagar materials present in exhibits 2, 3, and 4 in general are a great deal higher than in exhibit 1, and some of those impurities tend to accelerate or inhibit the growth of many microorganisms—make it less of an inert material. The witness, to sum up, stated that the impurities in exhibits 2, 3, and 4 render them unusuable for some of the purposes for which exhibit 1 can be used.

The president of the plaintiff concern, Mr. Lucian K. Small, testified that he is familiar with all the purchases of agar-agar by his concern and that those from C. M. A. go back to sometime early in 1944. His company has imported some unbleached flake agar. For a time it had an arrangement with C. M. A. to purchase its bleached flake agar for export to the United States, but was not free to purchase it for domestic consumption in Mexico; only for export, in this case at $2.25. Its exclusive arrangement to purchase for export all of the bleached flake agar from the Mexican Agar Co. was at an end sometime in August 1944. There was no arrangement between C. M. A. and his company which precluded the Mexican company from selling freely to all purchasers in the Mexican market for home consumption. The witness on his various trips to Mexico discussed matters having to do with general economic conditions and was told the price C. M. A. was quoting early in 1944, i. e., 26.14 pesos per kilo, which the witness converted into American currency as $2.45 per pound. The witness stated that to the best of his knowledge no other bleached flake agar was being offered at any higher price in Mexico, and he knew of no shipments by the same manufacturer at any higher price. It was his statement that "we" (I assume he meant his company) were probably better posted than anybody in the United States on the market. He himself was handling the sales in this country and kept in close touch with the market.

The affidavit, plaintiff's exhibit 8, is made by the president of the Alga-Mex company and certifies that during the year 1944 he was familiar with all of the transactions of said corporation, its production, manufacture and sale, and offers and sales of agar by "any other company," and that said corporation did not at any time during the year 1944 offer or sell bleached flake agar for domestic consumption in Mexico or for export to the United States, and had none for sale during that period; that C. M. A. was freely offering for sale bleached flake agar in Mexico and that said company was the only one that was offering such merchandise in Mexico; that the principal market for such merchandise was at Ensenada, where it was freely offered for

sale for consumption in Mexico from March 1944 at 24 Mexican pesos per kilo ($2.25 per pound, United States currency), and for export to the United States during the same period, at $2.45 per pound (26.14 pesos per kilo), both packed; that there was no similar merchandise offered in Mexico at any higher price during that period for domestic consumption and that there was no other offering of bleached flake agar either for consumption in Mexico or for export; that Alga-Mex had only bleached, granulated agar to offer or sell, and the additional cost of granulating and loss in processing would make the granulated agar a more expensive product and not the same or similar to the bleached flake agar offered or sold by C. M. A.; that bleached flake agar was sold in 5-pound paper bags, whereas the granulated was sold in cartons holding 5, 10, 20, or 25 kilos in wholesale quantities of 300-kilo lots, and that lesser quantities were at a higher price; that Alga-Mex commenced manufacturing agar in 1942 and at no time up to and including the last of 1945 did it sell or offer for sale any bleached flake agar either for domestic consumption or for export to the United States or any other country, and during 1944 did not manufacture any flake agar, bleached or unbleached.

Defendant's collective exhibit 9, a report of Mr. W. W. Fraser, Treasury representative, states that he obtained his information from C. M. A. at Ensenada, through the general manager and through an inspection of the company's books of account and other records. From those sources, he learned that the Government of Mexico exempted C. M. A. from payment of all taxes for 5 years, as it was a new industry. He obtained a sample of bleached flake agar imported by the American Agar & Chemical Co. on September 9, 1944. The American Agar firm is financially interested in C. M. A., its contract with that company providing as follows:

C. M. A. was to build a plant at Ensenada for the manufacture of agar-agar from funds advanced by the American Agar company, the latter to furnish necessary machinery and equipment as well as technical advice. The cost of the installation of the machinery was to be borne by C. M. A. The latter agreed to sell all of its products exclusively to the American Agar company. Both parties agreed that at the time of signing the contract, December 28, 1943, a price could not be set for finished products but would have to be determined later. Attached to this report is a written agreement (exhibit 2 thereof) dated June 19, 1944, wherein the two parties agreed that the price of the bleached flake agar was to be $2.25 per pound and for unbleached flake $2 per pound f. o. b. Ensenada. This agreement expired August 31, 1944.

The American Agar company has invested approximately $60,000 in C. M. A. plant. Of this amount, some $18,728 was put into the plant while about $40,412.95 was spent for equipment and installation.

Agar-agar is produced from a marine weed known as gelidium, which is obtained from the sea in the vicinity of Ensenada by divers.

C. M. A. produces principally bleached flake agar, but has some unbleached. It has not produced any agar in the granulated or powdered form.

C. M. A. does not freely offer its merchandise to all purchasers for exportation to the United States, but sells exclusively to American Agar & Chemical Co. One shipment manufactured prior to August 31, 1944, but delivered subsequently, was invoiced at the above agreed prices.

In exchange for the concession granted by the Mexican Government for certain gelidium beds located in waters adjacent to Ensenada, Mexico, C. M. A. was required to sell for home consumption any amount of agar-agar which might be needed by Mexican interests, but to date no sales had been made for home consumption.

C. M. A. made a shipment of 88 bags (440 pounds) of bleached agar to a Brazilian firm during July 1944 on an order from American Agar. The sale was to American Agar at $2.25 per pound f. o. b. Ensenada, and the merchandise was sent to Brazil with a declared value of the same amount. C. M. A. understood that American Agar had sold the merchandise to the Brazilian firm for $3 per pound f. o. b. Ensenada.

The report further stated that there were no restrictions on the resale or use of the C. M. A. product. It issues no catalog or price list. Neither cash nor trade discounts are given. The merchandise is packed in paper bags, 5 pounds to the bag. The prices are net in United States, f. o. b. factory at Ensenada. The American Agar company sends its own trucks to Ensenada, the expense thereof being for the account of the importer. No taxes are paid due to the waiver by the Mexican Government for a period of 5 years. The consular invoice fee is extra. The principal market is at Ensenada. The selling price does not depend on or vary with the size of the order. No drawback, refund, or other allowance is paid to C. M. A. or to anyone else on the exportation of the merchandise. C. M. A. is free to sell agar-agar to Mexico to all purchasers for home consumption, but no such sales have been made.

The report also contains an analysis of the cost of production, with which we are not here concerned.

The report states that it would appear that appraisement would be justified at $2.25 per pound for the bleached and $2 per pound for the unbleached, unless a higher foreign or export value was found for similar merchandise from other manufacturers.

Collective exhibit 10, a report of this same Treasury representative, on further investigation, states that he visited the offices of the Alga-Mex company on November 21, 1944, and was informed by the gen-

eral manager that the Mexican Government exempted the company from payment of all taxes for a period of 5 years, as a new industry. The Treasury representative inspected the books of account and other records and was furnished supplemental information by the general manager. Alga-Mex manufactured agar-agar in flake form and also in granulated or powdered form from a marine weed known as gelidium which it purchases in Ensenada. The Treasury representative was informed that the firm had not made any sales of agar-agar in flakes for exportation to the United States. A sale of 300 kilos of granulated or powdered agar-agar was made to the Consumer Import Co. of New York City on February 21, 1944, at $2.50 per pound f. o. b. Nuevo Laredo, with the cost of packing included. Freight included in this price was 1.56 pesos per kilo. The manager informed the Treasury representative that he prefers to manufacture agar-agar in granulated or powdered form to that in flake form. Inasmuch as the chemical properties are the same and as the cost of manufacture was approximately the same, he stated that he preferred to manufacture in the granulated or powdered form, as his firm found it easier to do so and less expensive in shipping. Although no sales had been made for exportation to the United States of agar-agar in flakes by his concern during the years 1943 and 1944, the company had been free to do so. This firm's freely offered price for the flakes during the first 9 months of 1944 had been $2.50 per pound f. o. b. Nuevo Laredo, packed; that effective October 1, 1944, the freely offered price has been $3 per pound, packed, f. o. b. factory, Azcapotzalco, D. F., Mexico. There is neither a cash nor trade discount and no catalog or price list. The merchandise would have been packed in cardboard cartons holding either 1, 10, 20, or 25 kilos. The cost of the containers and labor would have been included in the price of the merchandise. During the first 9 months of 1944, the terms of sale would have been $2.50 per pound, net, f. o. b. Nuevo Laredo, packed; and from October 1, 1944, $3 per pound f. o. b. factory, packed. The principal market was Azcapotzalco, D. F., Mexico. The manufacturer sells only at wholesale. Those who would have purchased 300 kilos or more in flake form during the year 1944 would have been granted the freely offered prices mentioned above. Purchasers of lesser quantities would have paid a slightly higher price.

On the question of foreign value, the manager stated that his firm has freely offered and sold agar-agar in flake form, as well as in a granulated or powdered form, to all purchasers for home consumption, at wholesale, without restriction as to resale or use. Three sales of the flake form are set forth which took place in November and December 1943, the terms f. o. b. factory, packed, stamp tax exempt. These sales were the only ones of flake agar-agar, but numerous sales were made of the granulated or powdered form. The freely offered

price for the flakes in wholesale quantities up to October 1, 1944, was 30 pesos per kilo, packed, f. o. b. factory. It had been asking 36 pesos per kilo, packed, f. o. b. factory, for the granulated or the flake form since October 1, 1944. However, there had been no sales of the flakes since December 6, 1943.

This report enclosed as exhibit 1 a sample of the agar-agar flakes sold to Labratorio Quimico Central in Mexico City (the sales above mentioned) during the months of November and December 1943, which merchandise has been freely offered to all purchasers at 36 pesos per kilo, packed, f. o. b. factory, since October 1, 1944.

The report stated that while C. M. A. manufactures agar-agar flakes in bleached and unbleached forms, Alga-Mex manufactures it in only one form. The statement of the general manager was that some people were of the opinion that the Alga-Mex flaked agar-agar was bleached, while others were of the contrary opinion. When advised that his product did not appear to be as white as that manufactured by C. M. A., he said that the latter no doubt was treated or manufactured in a different manner than his. He did not give the Treasury representative a definite statement as to whether his agar-agar was bleached or not. Nor would he say just what the difference in price would be to buyers of less than 300-kilo lots.

Collective exhibit 11, a report of the same Treasury representative, contains further information relative to the agar-agar manufactured by Alga-Mex. This report is dated in February 1945. Insofar as pertinent, it states the following: The principal uses to which agar-agar is put by buyers in Mexico are (1) the packing of meats; (2) the manufacture of candies and ice cream; and (3) in laboratory bacteriology work. Both types of flakes, whether bleached by sunning or by the chemical process, are interchangeable and can be utilized for any of these principal uses, according to the manager of Alga-Mex. A sample of the chemically bleached agar-agar flakes of Alga-Mex was forwarded with a copy of the report, but this is not pertinent to the present inquiry inasmuch as the chemical process of bleaching was not undertaken by this firm until the beginning of that year, whereas the present merchandise was exported in July 1944. In regard to a shipment of unbleached flake agar manufactured by La Industrial de Ensenada, which the Bureau of Customs had advised this Treasury representative had been purchased in November and entered at Newark, N. J., December 8, 1944, which was invoiced and entered at $3.25 per pound c. i. f. San Ysidro, duty paid, the report states that the writer thereof made numerous inquiries and was unable to learn of other manufacturers of agar in Mexico than C. M. A. and Alga-Mex and that persons at Ensenada selling gelidium were unaware of the existence of the firm of La Industrial de Ensenada. Also, in view of

the fact that Alga-Mex now claims that the agar flakes sold to Labratorio Quimico Central, Mexico City, were bleached, the writer of the report stated it would appear that the sale of unbleached flakes reported by the bureau as having been made by La Industrial on November 23, 1944, will not be considered as similar merchandise to that sold by Alga-Mex. This report further stated that prior to October 1, 1944, Alga-Mex freely offered to all purchasers in wholesale quantities for consumption in Mexico, without restriction as to resale or use, agar-agar flakes (sun bleached) at the price of 30 pesos per kilo, packed, f. o. b. factory. During the period October 1, 1944, to and including December 31, 1944, the same merchandise was freely offered at the price of 36 pesos per kilo, under the same terms.

The witness Selby, when recalled to the stand, was shown exhibit 1, the sample referred to in collective exhibit 10, being a sample of Alga-Mex agar-agar flakes sold in Mexico City. He described it as being in the form of what has been technically considered broken sheet agar, which is agar which has been prepared in the form of a sheet of gelatin—agar gelatin—which is allowed to dry, and then is broken up by a hammer mill. He stated that according to the terminology common in the industry, it is not considered bleached flake agar. He was also shown the sample referred to in collective exhibit 11 and stated that it is very similar in physical form to the above-noted exhibit 1. He would not say that it is bleached flake agar. On cross-examination, he stated that he knows the last-named sample is not bleached flake agar because of the physical shape, the two-dimensional rather than the three-dimensional form of the layers. In comparing this sample with the sample of the instant merchandise, he stated that when the particles are allowed to rest on a similar surface they are three-dimensional in that they have no common plane, but exist in all three planes in distinction to the flat characteristic of the sample with collective exhibit 11. He would call the latter bleached. It is not a flake in the terminology that is common in the North American agar-agar industry. This is also true of exhibit 1 to collective exhibit 10.

The witness Shipman was recalled and counsel made an offer of proof as to the witness' conference with a customs agent on July 19, 1945, and later, with respect to this importation. Objection was made to this offer by Government counsel on the ground that the witness had already testified at length and the presumption is that he did not tell the agent anything other than he had testified to before the court.

From this voluminous record it is clear that the plaintiff concedes and the Government does not deny that there is no export value for this merchandise on the date of exportation. This is due to the fact

that sales for export to the United States were restricted to plaintiff until after August 31, 1944. In view of said control or limitation, such sales cannot be used as the basis for determining value. *Good-year Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158; *Meadows, Wye & Co. (Inc.) et al.* v. *United States*, 17 C. C. P. A. (Customs) 36, T. D. 43324; *M. V. Jenkins et al.* v. *United States*, 34 C. C. P. A. (Customs) 33, C. A. D. 341.

The appraisement was made on the basis of similar merchandise; whether at foreign value or export value does not appear. Before resort can be had to the price of "similar" merchandise it must be ascertained that no "such" or identical commodity exists. *United States* v. *Meadows Wye & Co., Inc.*, 15 Ct. Cust. Appls. 451, T. D. 42643; *Prudential Lumber Corp. et al.* v. *United States*, 69 Treas. Dec. 1505, Reap. Dec. 3850; *General Foods Corporation et al.* v. *United States*, 22 Cust. Ct. 401, Reap. Dec. 7663.

The testimony discloses that there was, at the time this merchandise was exported, a foreign value for such merchandise in Mexico. Therefore, that value would govern. The principal market is shown to be Ensenada. It is further shown by a preponderance of evidence that the merchandise which was used as a basis of comparison by the appraiser, i. e., the merchandise manufactured by the Alga-Mex company, is not similar to the instant bleached flake agar-agar and could not be used interchangeably therewith. It is noted that the Treasury representative in his report (collective exhibit 9) admits that in the absence of any similar merchandise to that at bar, the price at which the merchandise was entered in the instant entry ($2.25 per pound, net, packed, f. o. b. Ensenada) would be the proper value for appraisement of the instant merchandise. It further appears from the evidence that this merchandise was freely offered for sale in the principal market, Ensenada, at the date of exportation herein at the above price, packed in 5-pound bags.

From the record I find as facts:

1. That the merchandise consists of bleached flake agar-agar manufactured by Compañía Mexicana de Agar, S. de R. L., of Ensenada, Mexico, and was exported from Mexico July 20, 1944.

2. That at the time of exportation all sales of identical merchandise for export to the United States were restricted to the plaintiff.

3. That at the time of exportation no similar merchandise was sold or freely offered for sale, to all purchasers in Mexico, either for domestic consumption or for export to the United States.

4. That the price, at the time of exportation of the instant merchandise, at which such merchandise was freely offered for sale to all purchasers at Ensenada, the principal market therefor in the country of exportation, for domestic consumption, in the usual wholesale

quantities and in the ordinary course of trade, was $2.25 per pound, net packed, f. o. b. Ensenada..

I conclude as matters of law:

1.   That the market for export to the. United States of agar-agar such or similar to that here involved was controlled.   Therefore, there was no export value as defined in section 402 (d) of the Tariff Act of 1930.

2.   That the proper basis of value of the agar-agar in issue is foreign value, as defined in section 402 (c) of said tariff act, as amended by the Customs Administrative Act of 1938, and that the usual wholesale quantity was 100 pounds.

3.   That such value was $2.25 per pound, net packed, f. o. b. Ensenada, Mexico.

Judgment will be rendered accordingly.