(A. R. D. 19)

UNITED STATES *v.* AMERICAN AGAR & CHEMICAL CO.

Entry No. 8–C.

First Division, Appellate Term

(Decided March 12, 1953)

*Charles J. Wagner,* Acting Assistant Attorney General (*Richard F. Weeks* and *Samuel D. Spector,* special attorneys), for the appellant.
*Philip Stein* (*Marjorie M. Shostak* of counsel) for the appellee.

Before OLIVER and MOLLISON, Judges.

OLIVER, Chief Judge: The merchandise in question consists of bleached flake agar-agar which was manufactured by Compañía Mexicana de Agar, S. de R. L., of Ensenada, Mexico (hereinafter referred to as C. M. A.). The shipment involved herein was exported from Mexico in July 1944, and entered through the subport of San Ysidro, Calif. The merchandise was invoiced and entered on the basis of foreign value, as defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, at $2.25 per pound net packed f. o. b. Ensenada. Appraisement was made at 30 pesos per kilo (equal to approximately $2.80 per pound) on the basis of what the appraiser regarded as similar merchandise manufactured by Alga-Mex, S. A. de C. V., of Mexico City (hereinafter referred to as Alga-Mex).

The case is before us at this time as a review of the decision in *American Agar & Chemical Co.* v. *United States,* 27 Cust. Ct. 383, Reap. Dec. 8020, wherein the trial judge upheld the importer's entered value as the statutory foreign value, section 402 (c), as amended, *supra,* of such merchandise.

The Government, appealing from the decision of the trial judge, has assigned nine errors. They are as follows:

"1. In finding and holding contrary to law and without evidence in support thereof, that there was a foreign value for this merchandise, as defined in section 402 (c), Tariff Act of 1930, as amended, based upon a freely offered price of such merchandise in the principal markets of Mexico and in not finding and holding to the contrary.

"2. In not finding and holding that there was a foreign value based upon the freely offered price of similar merchandise, as defined in section 402 (c) of the Tariff Act of 1930, as amended.

"3. In finding and holding that the merchandise sold or offered for sale by the Alga-Mex, S. A. de C. V. in usual wholesale quantities was not similar for valuation purposes to the imported merchandise.

"4. In finding and holding without any evidence in support thereof that at the time of exportation herein the price at which such merchandise was freely offered for sale to all purchasers in usual wholesale quantities, in the ordinary course of trade in the principal markets of Mexico for home consumption, was $2.25 per pound net packed f. o. b. Ensenada.

"5. In finding and holding without evidence in support thereof, that the usual wholesale quantity for the involved merchandise was 100 pounds.

"6. In finding and holding that the importer has made out a *prima facie* case and in not finding and holding to the contrary.

"7. In finding and holding that Ensenada, Mexico was the principal market for such merchandise, and in not finding and holding that Azcapotzalco and Ensenada, Mexico were the principal markets for such or similar merchandise in the country of exportation.

"8. In finding and holding that the entered value of $2.25 per pound net packed, f. o. b. Ensenada, Mexico represented the correct dutiable foreign value, and in not finding and holding that the appraised value of 30 pesos (Mexican) per kilo, net packed, represents the correct dutiable value of the involved merchandise at the time of exportation thereof.

"9. In entering judgment contrary to the facts and contrary to the law."

The trial judge found that sales for export of this merchandise were restricted to the importer of the shipment in question, and, therefore, eliminated export value, as defined in section 402 (d) of the Tariff Act of 1930, as a basis for appraisement of such merchandise. Appellant has assigned no error to that conclusion. The subject is, therefore, not before us for discussion.

The case was very thoroughly presented before the trial judge. In fact, the importer's line of proof included evidence relating to importations of bleached flake agar from C. M. A. that occurred long after the exportation of the present merchandise, but the trial judge, in his decision, refused to consider any proof concerning those later ship-

ments which are the subject of withheld appraisements. In our consideration of the record, we adhere to the position taken by the trial court and confine our review of the proof to the time of exportation of the shipment under consideration.

The decision of the trial judge includes a most exhaustive analysis of the proof introduced by both sides. No useful purpose would be served to repeat such detail herein. Suffice it to say that we accept the review of the record by the trial judge as an accurate outline of the proof, but in our discussion of the present issues we shall refer only to such portions as are pertinent for the conclusions reached.

Agar-agar, the merchandise in question, is produced from a seaweed called gelidium. Japan had a monopoly in supplying that raw material to the United States until the outbreak of the war. Thereafter, and at the time of exportation of the present merchandise, in July 1944, Mexico was the principal source of the desired seaweed. During the war, the importer herein "manufactured agar and was practically the sole supplier of agar to contractors of the Army and Navy of the United States, and was also the supplier to the Defense Supplys Corporation" (R. 13). Knowing the principal source of the desired raw material to be Mexico, the importer herein financed the construction of a plant at Ensenada, Mexico, for the manufacture of agar-agar by C. M. A., who had a concession from the Mexican Government to gather gelidium. The importer had no ownership or financial interest of any kind in C. M. A. As a consideration for the assistance given to C. M. A., the importer acquired the right to receive all of the excess raw material obtained by C. M. A. and was, "obligated for a certain period of time to take their finished product if it was not sold in Mexico" (R. 52).

The facts set forth in the preceding paragraph are included in the testimony offered by the vice president of the importing corporation, who also testified concerning market conditions in the country of exportation. Because of the importer's close connection with C. M. A., the witness made several trips to Mexico over a period extending through several months, including the time of exportation of the shipment under consideration, when he investigated the conditions in Mexico with respect to agar-agar. His testimony in connection therewith can be summarized as follows.

There were only two manufacturers of agar-agar in Mexico. One was C. M. A., the producer and exporter of the shipment under consideration; the other was Alga-Mex, located in Mexico City, and whose merchandise was used by the appraiser as a basis for the value adopted by him. While both companies manufactured agar-agar from substantially the same raw material obtained off the coast of Lower California, each produced a product materially different from the other.

Bleached flake agar-agar manufactured by C. M. A. resembles a small corn flake "except instead of conveying to you the idea of the yellow color of a corn flake, you must assume it to be quite white" (R. 49). Certain demands of purity are made to exist in the finished product. The condition is essential for the chief use of bleached flake agar-agar in laboratories for bacteriological use. A minor use is in the manufacture of impression material used by dentists for precision work.

Alga-Mex produced only ground agar-agar, which was dried and bleached before grinding. It was manufactured in "somewhat of a makeshift plant," described as a pilot plant. The finished product was "a mass of material that has been run through a grinder," after being dried on canvas sheets or boxed in an enclosure and then scraped off. The agar-agar that Alga-Mex "were making could not be made in a flake form. They had no provision even for the drying that is necessary to use for the purpose of drying a flake agar, which takes starch" (R. 48). At the time of exportation of the merchandise in question, Alga-Mex offered its product at a price no higher than $2.50 per pound, f. o. b. Nuevo Laredo, Mexico. The wholesale quantity for the merchandise was 300 kilos.

Testimony of the president of the importing corporation, as it relates to the time of exportation of the shipment under consideration, is to the effect that he was familiar with all purchases of agar-agar by his firm and that there was no arrangement between C. M. A. and his company precluding the Mexican company from selling freely to all purchasers in the foreign market for home consumption.

The president of Alga-Mex executed an affidavit (exhibit 8) wherein he testified that at the time of exportation of the present merchandise Alga-Mex did not "sell or offer for sale any bleached flake agar for domestic consumption in Mexico or for export to the United States or any other country, and in fact * * * did not make or manufacture any flake agar, bleached or unbleached." The witness further testified that he was familiar with "offers and sales of agar by any other company," and that "he knows of his own knowledge" C. M. A. freely offered for sale, in the principal market of Ensenada, bleached flake agar at a price of $2.25 per pound, and that C. M. A. was the only manufacturer of such merchandise in Mexico. The witness further testified that Alga-Mex had only bleached, granulated agar to offer or to sell, which merchandise was freely offered in wholesale quantities of 300 kilos, and when sales were at less than wholesale quantities, the price was higher.

The Government (appellant) introduced three Treasury representative's reports (collective exhibit 9, collective exhibit 10, and collective exhibit 11). As stated by Government counsel at the trial below, "The appraised value was made on the basis of these

reports which cover this date of exportation." · We proceed now to review each of the reports.

The report (collective exhibit 9) shows that C. M. A., a limited liability company in Mexico, acquired from the Mexican Government "a 15 year concession which is renewable every five years, for certain gelidium beds located in the waters adjacent to Ensenada." Gelidium is a particular kind or species of marine weed used for the manufacture of agar-agar. Under its concessions, C. M. A. was required to sell for home consumption any amount of agar-agar needed by Mexican interests. C. M. A. manufacturers principally bleached flake agar. It also produces some unbleached flake agar, but does not manufacture any agar in the granulated or powdered form. The company is free to sell to all purchasers in the country of exportation for home consumption, but no such sales had been made up to the time of exportation of the shipment under consideration. The selling price of bleached flake agar by C. M. A. did not vary with the quantity purchased, and the principal market therefor was Ensenada, Mexico.

The two subsequent reports (collective exhibits 10 and 11) are directed almost exclusively to the business activities of Alga-Mex. The information contained therein is attributable to the general manager of Alga-Mex. That company manufactured agar-agar in flake form and in a granulated or powdered form, although the preference of the company was to produce the product in powdered form because it is "easier to do so, and less expensive in shipping." The merchandise is packed in cardboard containers holding either 1, 10, 20, or 25 kilos. A wholesale quantity is 300 kilos, and "purchasers buying less than 300 kilos would probably pay a little more than those who purchased in quantities of 300 kilos, or more." The principal market is Azcapotzalco, Mexico. Although Alga-Mex manufactured agar-agar in both the powdered and the flake forms, the company never made any sales of flakes for exportation to the United States. Three sales of the flake form in the foreign market for home consumption are listed in the report, collective exhibit 10. Each sale covered a quantity of only 25 kilos. The sales were made in November and December 1943, 7 and 8 months prior to the time of exportation of the merchandise under consideration. Without further identification thereof and in the light of the testimony of the president of Alga-Mex, they have no probative value. Sales by Alga-Mex for export to the United States were made only of the granulated or powdered agar-agar. The report (collective exhibit 10) shows a sale in February 1944, to the Consumer Import Co. of New York City, in quantities of 300 kilos at a price of $2.50 per pound, f. o. b. Nuevo Laredo, Mexico, cost of packing included. The report further states that the same price would apply to sales of agar-agar in flake form for export to the United States, but such sales were never made.

It should be noted that the bleached flake agar-agar in question was appraised on the basis of a product allegedly "similar" to the present merchandise, and that the importer's claimed value is based on "such," or identical, merchandise. Under a well-established statutory construction, the words "such" and "similar" as they appear in section 402 of the tariff act, in connection with the definitions of foreign and export values, are not used synonymously, but alternatively. (*United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714.) It is proper, therefore, at this point to determine whether the product manufactured by Alga-Mex is similar to that produced by C. M. A.

The similarity of merchandise for appraisement purposes has been the subject of much litigation both in this court and in the Court of Customs and Patent Appeals. The *Irving Massin & Bros.* case, *supra*, construed the word "similar," as used in section 402 of the Tariff Act of 1930, as follows:

> In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b).

While the foregoing intrepretation embraces several elements by which similarity for appraisement purposes may be determined, authorities on the proposition have not required that all of the said items of comparison shall be present in deciding the issue.

In the case of *United States* v. *Kraft Phenix Cheese Corp. et al.*, 26 C. C. P. A. (Customs) 224, C. A. D. 21, imported "Portion" Roquefort cheese was held to be dissimilar to "Standard" Roquefort sold in the foreign market because each was subject to different treatment resulting in varying properties for both.

The case of *United States* v. *Luigi Vitelli Elvea, Inc., et al.*, 11 Cust. Ct. 437, Reap. Dec. 5941, concerned value of canned tomatoes from Italy. There, it was shown that the tomato products sold for export were processed to meet regulations of the Department of Agriculture governing the quality of the merchandise and the method of packing. The merchandise sold for home consumption for the Italian market had no such standards. In holding the two products not to be similar for valuation purposes, the court said that the decisive factor was the element of substitution, and that while the export pack might have been substituted for the home-consumption pack, the reverse was not true because the product sold for home consumption in Italy would not meet the American standards.

In the decision in the case of *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837, the court expressed very clearly the

approach to be taken in considering the issue of similarity for valuation purposes. We quote therefrom:

* * * The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402 (b).

In the present case, the record is conclusive in showing that bleached flake agar-agar manufactured by C. M. A. (the merchandise in question) differs from the agar-agar produced by Alga-Mex. The vice president of the importing corporation testified that the products of the two companies are manufactured under different conditions. Agar-agar, produced by C. M. A., is carefully processed and is intended to and does supply a trade different from that to which the Alga-Mex product is supplied. Agar-agar manufactured by Alga-Mex was, at the time of exportation of the present merchandise, produced in a somewhat makeshift plant that lacked facilities for the essential drying process used in manufacturing flake agar-agar. The product of Alga-Mex was impure. "It would be impossible for you to use the Alga-Mex product the way they were making it, for the laboratory use." The difference in physical properties between the competing products was given by Horace H. Selby, a chemist employed by the importer of the present merchandise, who analyzed the different kinds of agar-agar manufactured by C. M. A. and Alga-Mex. Differentiating the products of both companies, the witness testified as follows:

* * * There are two standards which are official in the United States for the qualities of agar. One is the National Stock Catalogue Specification of the United States Army for bacteriological agar, and the other is the United States Pharmacopoeia, which Mr. Shipman mentioned before. Samples of Alga-Mex more than half the time failed to meet the requirements of the United States Pharmacopoeia in the first place, and all the time they failed to meet the insoluble matter of the Army specification. That is one particular difference which might have a bearing on the case. Another is that what is called the clarity of solution of these agar samples from Alga-Mex, which is uniformly very low. By clarity of solution I mean that if a solution is made up of agar and distilled water, it can be placed in an apparatus beneath which is some standardized illuminated printing. The depth of this solution can be varied over that printing until the printing becomes illegible, and the number of millimeters of solution to which this printing can remain legible is considered in millimeters the clarity of the solution. Normally the C. M. A. agar will have a clarity between 300 and 800 millimeters by that test. The Alga-Mex samples have 88, 100, 240, 80, 30 and 10, which makes such a product not utilizable by bacteriological laboratories without further costly purification. Those are two examples.

Emphasizing further the relatively impure condition of the Alga-Mex products, the witness, Selby, testified that they "are so uniformly low in clarity" they must be treated quite extensively, and in such a manner "which most laboratories are not fitted to perform." The marked difference in appearance between the products of the two companies is "due to the granular or ground nature of the Alga-Mex agar, its comparative darkness, and its apparent contamination with carbonization material" (R. 107).

The proof before us, as it relates to the issue of similarity, is sufficient to hold, in line with the statutory construction invoked in the cited authorities, that the agar-agar produced by Alga-Mex is not similar to the merchandise in question.

Thus we proceed to a consideration of the record as it relates to bleached agar-agar, such as that involved herein, as claimed by the importer. In this connection, the evidence is conclusive in showing that there had been no sales of such merchandise in Mexico at the time of exportation of the shipment under consideration. The trial court found *"from the evidence* that this merchandise was freely offered for sale in the principal market, Ensenada, at the date of exportation herein at the above price, packed in 5-pound bags." [Italics added.]

The primary question, at this point, is whether the record contains evidence to support the lower court's finding that the merchandise in question was freely offered for sale in the principal market at the time of exportation at the price found by the trial court. It should be noted that the importer (plaintiff below) offered no evidence of any kind (either oral or documentary) from the foreign manufacturer and exporter of the present merchandise, which, it cannot be disputed, is the best source from which proof might have been offered to support plaintiff's position. The record does not contain the slightest indication in explanation of the omission. The vice president of the importing corporation, testifying with reference to his investigation in Mexico concerning market conditions relating to the agar-agar in question, stated that "I got in touch particularly with the people representing our own Government in Mexico, and tried to find purchasers for the agar in Mexico." He mentioned that the Mexican manufacturer of the present merchandise sent out letters, but the letters, themselves, were never produced. The gist of his testimony that this merchandise was offered for sale in Mexico is as follows (R. 22):

By Mr. Stein:

Q. Did you ascertain that agar agar in bleached flake form was being offered for sale in Mexico to all purchasers at or about the period from July 20, 1944 to January 16, 1945?—A. Yes.

Q. How did you find that out?—A. Through our connection with the Compania Mexicana de Agar.

Another excerpt of the witness' testimony along the same line is as follows (R. 32–33):

By Mr. Stein:

Q. Do you know the price at which the same merchandise was being offered by the same manufacturer from whom you purchased this importation in Mexico on or about July 20, 1944?  * * *

Mrs. Bennett: Yes or no?

The Witness: Yes.

By Mr. Stein:

Q. How do you know?—A. On account of our connections with the Mexican company.

Q. You knew at all times at what price they were offering it for sale for domestic consumption in Mexico as well as for export?—A. That is correct.

Q. And at what price were they offering it for sale for domestic consumption in Mexico at or about July 20, 1944?

        *         *         *·         ·*         *         *         *

The Witness: $2.25 per pound.

The same sort of testimony appears in the affidavit (exhibit 8) executed by the president of Alga-Mex who makes the general and unsupported statement that C. M. A. "was freely offering for sale bleached flake agar in the Republic of Mexico * * *."

While offers for sale may be sufficient for a finding of foreign value, there must be a showing that the merchandise under consideration was "freely offered for sale," within the requirements of the statute, section 402 (c), as amended, *supra*. In the case of *Oceanic Trading Co.* v. *United States*, 21 C. C. P. A. (Customs) 146, T. D. 46478 (at p. 150), the rule was stated as follows: "* * * where it has been established that such or similar merchandise was freely offered for sale, *as required by the statute*, the absence of evidence of actual sales is not of vital consequence." [Italics added.]

Plaintiff's evidence, as hereinabove outlined, attempting to show that bleached agar-agar, the same as the merchandise in question, was freely offered for sale at the time of exportation of the shipment under consideration, is in broad and general language and appears as unsupported declarations. Giving the statements the most favorable application to support the importer's contention, they cannot, even then, be held to be sufficient to meet the statutory requirements of foreign value, section 402 (c), as amended, *supra*, which reads as follows:

The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The most important element or requirement, under the circumstances developed herein, to establish foreign value within the foregoing definition is the existence of a market. The point was brought out in the case of *H. Redfern* v. *United States*, Reap. Circ. 1207, affirmed in *Same* v. *Same*, 17 C. C. P. A. (Customs) 117, T. D. 43453. In that case, it was admitted "by all parties concerned that there were no actual sales." The lower court rejected the evidence attempting to show that the merchandise was freely offered for sale, and in the course of its decision, Reap. Circ. 1207, *supra*, made the following statement:

* * * Where no actual sale of merchandise has ever been made in a foreign country, it can not be said that there is in that country a market for such merchandise.

In affirmance thereof, the appellate court, T. D. 43453, *supra*, said:

This statement may be intended to convey the thought that there could be no *ordinary course of trade* unless there were actual sales, or that, unless there were actual sales, there would be no *principal market* for this or similar merchandise, or that, without sales, there could be no usual wholesale quantities. [Italics quoted.]

The foregoing pronouncements from the *Redfern* case, *supra*, afford the basis for further discussion herein. In approaching this phase of the case, it should be emphasized that Mexico, the country of exportation of the present merchandise, became the source of the bleached agar-agar in question after the outbreak of World War II, when the previous outlet from Japan stopped, so that the manufacture of the product under consideration was virtually a new industry at the time of exportation of the present merchandise.

The vice president of the importing corporation testified that he made an investigation of the Mexican markets. His testimony with reference thereto is as follows (R. 57–60, inclusive):

By MRS. BENNETT:

X Q. Didn't you make an investigation of the Mexican markets?—A. Yes.

X Q. Then you only investigated the merchandise sold by the agar company in Ensenada and that sold by the Alga company in Mexico City; is that right?—A. Those were the only producers.

X Q. You made no other investigations of any other markets in Mexico; is that right?—A. I made investigation as to all markets in Mexico, and there were only two producers in Mexico.

X Q. What other efforts did you make to find other markets in Mexico?—A. I have tried, especially through our Foreign Economic Administration, who were in touch with all of the users of products—the drug section particularly—of agar, to find a disposal of any quantity of the product manufactured at Ensenada.

X Q. Will you please answer the question? What other investigation did you make as to any other markets in Mexico?—A. I don't understand your question.

*      *      *      *      *      *      *

JUDGE EKWALL: We can shorten this up. Just go over again what efforts you made to find out any and all markets for any and all agar agar products. What efforts did you make?

THE WITNESS: During the war, which of course ended on the 14th day of August, 1945, the United States Government, as part of the embassy, had an economic unit. That economic unit had men especially equipped in various lines of business that kept in touch with all conditions in Mexico; were seeking products for the United States, and were also acquainted with markets in Mexico. I have tried through our own Foreign Economic Administration to find markets for the product manufactured by the company at Ensenada. We have also, that is the company at Ensenada, made approaches through letters, to possible users of agar in Mexico.

BY MRS. BENNETT:

X Q. Is it your statement that the War Economic Board referred you to the other market in Mexico City for such or similar goods?—A. That is not my statement. In addition to it, we have found out every possible user of agar in Mexico and the Mexican company has written to them.

X. Q. Which Mexican company?—A. That is the Mexican company located at Ensenada.

X Q. The American agar company then was interested in selling the Mexican agar company's products in Mexico?—A. It was to the extent of giving them relief for the inventory that has accumulated in the manufacture of agar by them.

X Q. Was that true in July, 1944?—A. It was.

X Q. How did you learn of the market in Mexico City of the product manufactured by the Alga Company?—A. I made investigations as to any manufacturer of agar in the Republic of Mexico.

X Q. What investigation? How did you investigate? That is what I am trying to get. What did you do to investigate?—A. I made inquiries every place I could; at the embassy, at our economic unit, and the primary thing that might be adequate under some circumstances was that we knew that the raw weed from which agar was being or could be produced, was obtained on the Pacific Coast, and the purchasers for that weed were the plant at Ensenada and the Alga-Mex Company.

X Q. At Mexico City?—A. That is correct.

X Q. Then your inquiries were made at the embassy, and the economic board, as to markets in Mexico?—A. You were talking about the producers of agar. Are you talking about producers or users?

X Q. I am talking about markets. I asked you what investigation you made, what you did to investigate the location of the markets in Mexico for agar, and I believe you stated that you made inquiries from the embassy and the economic board. Did you make inquiries from any other source?—A. If you listen to the rest of my answer, the rest of my answer was that we made other investigations, such as you would make in the United States, through every type of publication to find people who would be in a line of business in the course of which a probability existed that they might use agar.

\*        \*        \*        \*        \*        \*        \*

From the foregoing quoted testimony, it is quite clear that while there may have been a willingness to sell bleached agar-agar for consumption in Mexico, no purchasers could be found. In other words, there was no market for the merchandise for home consump-

tion. Without a market for home consumption; there can be no foreign value under the statute.

Since the record before us will not support a finding of foreign value or export value, and there is not sufficient evidence from which to determine any other statutory value, proper procedure requires that the case should be remanded to the trial judge for further proceedings.

For all of the reasons hereinabove set forth, we find as matter of fact:

(1) That the merchandise consists of bleached flake agar-agar manufactured by Compañía Mexicana de Agar, S. de R. L., of Ensenada, Mexico, and was exported from Mexico, July 20. 1944.

(2) That the only other manufacturer of agar-agar in Mexico at the time of exportation of the present merchandise was Alga-Mex, S. A. de C. V., of Mexico City, a producer of ground agar-agar.

(3) That the bleached flake agar-agar manufactured by Compañía Mexicana de Agar, S. de R. L., was not similar to the ground agar-agar produced by Alga-Mex, S. A. de C. V.

(4) That bleached flake agar-agar was not freely offered for sale for exportation to the United States at the time of exportation of the present merchandise.

(5) That at the time of exportation of the present merchandise, there was no market in Mexico for bleached flake agar-agar.

Accordingly, we hold as matter of law:

(1) That there is neither a foreign value nor an export value for the bleached flake agar-agar in question.

(2) That the record is insufficient to find any other statutory value for the present merchandise.

The case is therefore remanded to the trial judge for further proceedings.

The judgment of the trial court is accordingly reversed.